

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-23-00061-CV

_____

IN THE INTEREST OF G.M., A CHILD

On Appeal from the 233rd District Court
Tarrant County, Texas
Trial Court No. 233-715118-22

Before Sudderth, C.J.; Birdwell and Bassel, JJ.
Memorandum Opinion by Chief Justice Sudderth

# MEMORANDUM OPINION

After receiving multiple reports alleging domestic abuse, the Department of Family and Protective Services (Department) investigated Appellant Mother's household and later filed a petition seeking conservatorship of her son G.M. and termination of Mother and Father's parental rights to G.M.[1] At the conclusion of a bench trial, the trial court terminated both Mother's and Father's parental rights to G.M. and appointed the Department permanent managing conservator of G.M.[2] In a single issue, Mother argues that the evidence was insufficient to support the trial court's determination that termination of her parental rights to G.M. was in his best interest. We disagree and affirm the trial court's order.

## I. Background

In March 2022, Mother was living in an apartment with her sons B.P. and G.M.[3] Beginning on March 9, 2022, the Department received multiple reports that the Children were victims of neglectful supervision and physical abuse. On the Child Protective Investigations (CPI) investigator's first visit to the apartment two days

---

[1]We use aliases to identify the children and Mother, and we identify family members by their relationship to the children or to Mother. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2). We refer to the trial witnesses using descriptive terms so as not to identify them.

[2]Father did not appeal the trial court's order.

[3]It appears from the record that Mother has at least three children. Only G.M. was the subject of this suit. We will refer to B.P. and G.M. collectively as "the Children."

later, she spoke with Mother, B.P., and G.M.  During that March 11 investigation:

- The investigator noticed that Mother was very "erratic," her eyes were wide, she appeared to have a very dry mouth, and she kept moving her lower jaw from side to side.

- Mother stated that Father had physically and emotionally abused her.

- Mother claimed that she was engaged to a man she called J.D. and that two of J.D.'s friends had been living with them at her residence but that she had "recently kicked them out."

- Mother admitted to using marijuana and agreed to submit to an oral swab drug test.

- Mother took two oral swab drug tests (she was unable to produce enough saliva for the first test to get an accurate read), and the second test returned positive for methamphetamine, amphetamines, and marijuana.

- Mother then admitted to using methamphetamine,[4] reporting that it had been a few days since her last use and claiming that she had some slipped disks in her back and that someone had told her that methamphetamine would keep her "high for days" and eliminate the pain.[5]

- Mother related that J.D. had also used methamphetamine.

- Mother admitted that "every now and then" J.D. would push her and that she also pushed him "to get him out of her face," but she denied that there had been any other physical violence in the household.

---

[4]Mother had initially said, during the same visit, that she took Tramadol daily. Tramadol is a prescription painkiller.  *See Hunter v. Tex. Farm Bureau Mut. Ins. Co.*, 639 S.W.3d 251, 255 (Tex. App.—Houston [1st Dist.] 2021, no pet.); *Lara Munoz v. Castillo*, No. 13-18-00451-CV, 2020 WL 1856476, at *5 (Tex. App.—Corpus Christi–Edinburg Apr. 9, 2020, no pet.) (mem. op.).

[5]She claimed that she tried it for the first time a few days earlier, felt nothing, immediately went to sleep, and did not want to use it again.

- B.P., who was 14 years old at the time, stated that Mother and J.D. often fought and that the police had been to the home "several times for various reasons."

- G.M., who was eight years old, said that "the police ha[d] been called to the home a few times" but that he was unsure why they were called.

- G.M. confirmed that he had seen J.D. and Mother fight, that they argued a lot, and that he had seen J.D. push Mother to the ground. He also said that he had been told by his brother that after J.D. pushed her down, J.D. hit Mother in the face.[6]

- While G.M. told the investigator that no one in the home used any drugs, he did say that Mother smoked something that helped her with her back pain, and both Mother and J.D. smoked it in the house.

In response to this information, the investigator implemented a safety plan with the family. As part of the plan, Mother's sister (Sister) moved in with her. Also pursuant to the plan, Sister would supervise all contact between the Children and Mother, and J.D. was prohibited from residing in the home and having any contact with the Children.

The investigator explained that both Mother and Sister would need to submit to drug testing by early the following week. In response to Mother's question as to whether it would be a urine drug test only, the investigator explained that she would be asking for a hair follicle test as well.

Three days later, after receiving another intake involving allegations of physical abuse in the home, the investigator made an unannounced visit to Mother's

---

[6]Although G.M. did not see J.D. hit Mother in the face, he reported that his brother was upset about it.

apartment. During that visit, the investigator observed Mother and Sister bleaching their hair, which made her suspect that they were attempting to alter the drug tests. But Mother and Sister both agreed to nail bed testing.

About a week later, in the early morning hours, Mother called the investigator. According to the investigator, Mother was frantic and reported that she had had another physical altercation with J.D. and had called law enforcement. Mother related that J.D. was "shooting" up methamphetamine and was out of control, she was afraid of him and scared he was going to hurt her, and she was ending the relationship. At that time, Mother finally admitted that J.D. had been violent with her in the past. She also said that she was aware that there was an outstanding warrant for his arrest because he had "skipped out on parole and [was] using drugs."

Eight days later, the investigator spoke with Sister, who was upset because after returning from taking the Children to school, she found J.D. at Mother's residence. According to Sister, Mother had brought J.D. there, and he had refused to leave the house when asked. Sister called the police because J.D. "had started to get upset and aggressive" when she told Mother and J.D. that he should not be in the home. Sister reported that he left the residence in the back of a police car, but she was unsure if he was actually arrested.

The next day, the investigator obtained the results of the drug tests that Mother and Sister had taken. Mother's urine had come back positive for benzodiazepines and marijuana, and her nail bed tests were positive for methamphetamine and

5

amphetamines "at very high levels." Sister's urine tested negative for all substances, but her nail bed tests had come back positive for methamphetamine, amphetamines, and marijuana, all at high levels. The investigator confronted Mother, who said that she knew that she was going to test positive for methamphetamine because she had already admitted to using it, but she could not explain her other positive results or why Sister had tested positive. Mother said that no other family member could take the Children or assist her in any way.

The Department then filed its petition initiating this termination proceeding, and B.P. went to live with his father. G.M. was removed from Mother's home and placed in a foster home with his younger sibling.

## II. The Evidence at Trial

Four witnesses testified at trial: the investigator, the permanency specialist, the permanency specialist's supervisor, and Mother herself. The following facts were developed through their testimony.

### A. Mother's Conduct and Lifestyle

Mother's relationships with Father and J.D. have been marred by domestic violence. Through the four witnesses, the trial court heard testimony about the domestic violence committed by each man:

- The permanency specialist testified that Mother had described Father as "a very abusive man" that had physically and sexually abused her.

- Mother testified that when G.M. was about five days old, Father took him and

6

"threw him across the bed."

- Although Mother testified that J.D. "never attempted to ever put his hands on" G.M., she nevertheless testified that J.D. used domestic violence to control her, that she was "always" fearful of him, and that the "the domestic violence just got worse" in the couple of months immediately before the trial. And Mother confirmed that she had never tried to seek help, such as going to a women's shelter.

- The investigator testified that as soon as J.D. had moved out of Mother's home pursuant to the safety plan that was implemented back in March 2022, Mother left the home to reunite with J.D.

- The permanency specialist testified that, at the time of trial, J.D. was in jail in Olympia, Washington, charged with an assault against Mother.

- The permanency specialist's supervisor testified that the domestic violence played a role in her assessment that Mother had not demonstrated that she could provide safe and stable housing and a nurturing environment, explaining that "a child [G.M.]'s age . . . would want to be protective of his mother, and with him trying to intervene, he could become harmed or even killed."

Additionally, Mother has a history of mental illness and drug use. Mother testified that she was diagnosed with a bipolar disorder and was on prescription medication at the time of trial. She testified that she was taking Abilify, a mood stabilizer for depression, but she also said that she had been "off of" Abilify for "about a year" and had "only been back on it for about a week and a half" before trial. She testified that she was not on any "anxiety meds," and she did not identify any other medicine she was on.

Mother admitted that she had had suicidal ideations several times since G.M. entered foster care in April 2022, but she denied having actually made suicide

7

attempts since April 2022.

The investigator testified that on March 11, 2022, just after having tested positive for methamphetamine and amphetamine via an oral swab, Mother admitted that she had used methamphetamine a few days earlier. The permanency specialist testified that less than a month before trial, on January 30, 2023, Mother had admitted to again using methamphetamine just a few days earlier. Mother testified that it had been over a week since she had last used methamphetamine and admitted that while it "probably would not show up" in her urine, it would show up in her hair. She claimed that she had not used methamphetamine since she had resumed taking her Abilify just a week and a half before trial.

Mother insisted that she never used drugs in front of her children. However, she admitted that she had been under the influence of drugs while G.M. was in her home.

The evidence also showed that Mother had failed to comply with her court-ordered service plan. Before trial, the trial court ordered Mother to complete a service plan. The permanency specialist gave Mother a copy of the plan, and Mother signed it.

Although Mother completed the recommended and required parenting classes and engaged in visits with G.M., which were part of the plan, she did not complete

8

her counseling sessions with Lena Pope.[7] She attended only "some" of the required Narcotics Anonymous meetings.

The service plan also required Mother to complete a drug and alcohol assessment through Lena Pope;[8] actively engage in a mental health assessment with MHMR;[9] obtain and maintain housing that was drug free, uninhabited with transient adult strangers, safe, and free of hazards; and attend and participate in domestic violence counseling and support groups through the Women's Shelter. The permanency specialist testified that Mother did not do any of those things. Mother had reported to the Department that "the services were too much for her" and that she was "over services and too stressed out."

The permanency specialist's supervisor testified that the issues that brought about the removal of G.M.—namely, the domestic violence and methamphetamine use—were still ongoing at the time of trial. Beyond that, the trial court was presented with evidence that Mother had not only continued her volatile relationship with J.D. but had also moved out of state with J.D. and away from G.M. and had only returned

---

[7]Mother reported that she had been discharged from the sessions because she missed two appointments.

[8]Lena Pope Home offers individual counseling in addition to drug treatment through group sessions. *See In re A.I.*, No. 02-22-00176-CV, 2022 WL 4374636, at *3 (Tex. App.—Fort Worth Sept. 22, 2022, pets. denied) (mem. op.).

[9]My Health My Resources. *See L.C. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-20-00481-CV, 2021 WL 1148959, at *7 (Tex. App.—Austin Mar. 26, 2021, pet. denied) (mem. op.).

to Tarrant County two days before her trial. During her time away from Tarrant County, Mother had also failed to maintain stable housing and employment.

Mother testified that, after the March 2022 incident in which he was "shooting" up, J.D. "quit," and they "kind of re-established" their relationship. During that period of time, J.D. briefly stayed in a halfway house, which he left without permission, before moving back in with Mother.

In June, J.D. took her car. Mother was apparently able to recover it, because she lived in the car until the time it was repossessed.[10]

In July, Mother and J.D. moved to Washington, where they lived in a tent, at least until it caught on fire. The permanency specialist, who was on the phone with Mother during the tent fire, recalled hearing "fire trucks . . . and a lot of people in the background talking," including J.D., who she said was cursing in a "hostile" tone of voice. When she asked Mother if she felt safe, Mother replied "sometimes."

Mother also testified that J.D. had threatened to kill her if she ever left him. She said that she believed he could and would kill her because he and his uncle had once killed a man during a home invasion.

At trial, Mother claimed to be "permanently" living with a couple in North Richland Hills,[11] whom she described as "friends" who "love[d] [G.M.] like their

_____

[10]Prior to living in her car, Mother had been evicted from her apartment.

[11]Mother equivocated on the permanence of her current living situation. She testified that she was living with the couple "[p]ermanently until I find a job and my

own." But at this point, Mother had only been back in Texas for two days.

As to employment, the permanency specialist's supervisor testified that, "[f]or the most part during this case," Mother had been unemployed.

At best, Mother's employment was sporadic. She testified that she used to work for Structure Technologies. She also testified that she had worked at U-Haul in April and May and then at Brookshire's in Weatherford in June. She also worked at McDonald's for about two weeks when she was living in Washington.

## B. G.M.'s Living Situation and the Parties' Plans for his Future

At the time of trial, G.M. was in a foster home. Although his foster parents did not want to adopt him, the permanency specialist's supervisor testified that if parental rights were terminated, then her agency would work with Court-Appointed Special Advocates (CASA) "to do some family finding." She testified that her agency had the names of two relatives who "might be a possible placement option" and that G.M.'s foster mother "might have some relatives who might be interested in adopting" him. She added that if the agency could not find any relatives, then it would list G.M. on TARE[12] "so he [could] find a forever home."

Mother believed that it was best for G.M. to stay in foster care "for right now,"

---

own apartment," adding, "I'm not going to stay there permanently. I mean -- but until I can get back on my feet."

[12]TARE is a website on which children who are available for adoption can be placed after their parents' rights are terminated. *See In re P.M.*, No. 11-20-00290-CV, 2021 WL 2470384, at *2 (Tex. App.—Eastland June 17, 2021, no pet.) (mem. op.).

11

but she requested that the trial court not terminate her parental rights and allow her to "work on things and do whatever plan or whatever is asked" of her so that she could prove that she could "be a good mom." She testified that she did not expect to take G.M. home right away, but he would be welcome to move in with her in the home where she was living with friends. She testified that G.M. was "okay" in his foster home because he was with people he knew and loved, and she did not want him to be taken away from that and adopted by a family he did not know. She testified that his goal was to be with her, "and that's what he[ was] holding on to." She asked the trial court to give her possessory conservatorship of G.M. instead of terminating her rights.

### III. The Trial Court's Order

The trial court found that termination of Mother's parental rights to G.M. was in his best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2). It also found that Mother had:

- knowingly placed or allowed G.M. to remain in conditions or surroundings that endangered his physical or emotional well-being, *see id.* § 161.001(b)(1)(D);

- engaged in conduct or knowingly placed G.M. with persons who engaged in conduct that endangered his physical or emotional well-being, *see id.* § 161.001(b)(1)(E); and

- failed to comply with the provisions of the court-ordered service plan, *see id.* § 161.001(b)(1)(O).

Mother does not contest any of these findings on appeal. Instead, Mother's

12

appeal is limited to a single issue complaining of the sufficiency of the evidence[13] to support the trial court's finding that termination of her parental rights to G.M. was in his best interest.

## IV. Discussion

### A. Standard of Review

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).

For a trial court to terminate a parent–child relationship, the party seeking termination must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *Z.N.*,

---

[13]In her brief, Mother lays out both the factual- and legal-sufficiency standards of review but contends only that there was "factually insufficient evidence to support the trial court's finding that the termination was in the best interest of the child." Because evidence that is factually sufficient is necessarily legally sufficient, *In re A.N.*, No. 02-22-00036-CV, 2022 WL 2071966, at *2 (Tex. App.—Fort Worth June 9, 2022, pet. denied) (mem. op.), our holding that the evidence was factually sufficient to support the trial court's finding that termination of Mother's parental rights to G.M. was in his best interest means that the evidence was also legally sufficient.

602 S.W.3d at 545. Due process demands the heightened standard of clear and convincing evidence because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *In re E.R.*, 385 S.W.3d 552, 555 (Tex. 2012) (quoting *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982)); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see also In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's finding and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the Department proved that the termination of the parent–child relationship would be in the child's best interest. Tex. Fam. Code Ann. § 161.001(b)(2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19. But if not—because the disputed evidence that could not reasonably support the finding is too significant—then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108. The factfinder is the sole judge of the witnesses' credibility and demeanor. *Id.*; *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

**B.     The Law on Best Interest**

14

Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013); *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the evidence in light of nonexclusive factors that the factfinder may apply in determining the child's best interest:

(A)     the [child's] desires . . . ;

(B)     the [child's] emotional and physical needs[,] . . . now and in the future;

(C)     the emotional and physical danger to the child now and in the future;

(D)     the parental abilities of the individuals seeking custody;

(E)     the programs available to assist these individuals to promote the [child's] best interest . . . ;

(F)     the plans for the child by these individuals or[, if applicable,] by the agency seeking custody;

(G)     the stability of the home or proposed placement;

(H)     the [parent's] acts or omissions . . . indicat[ing] that the existing parent–child relationship is not a proper one; and

(I)     any excuse for the [parent's] acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor

may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## C. Application

In her brief, Mother relies primarily on the eight years of G.M.'s life before he was removed from her home. She points to how well he was doing in the foster home and how "well-adjusted" he appeared to be, facts which she contends a reasonable factfinder could attribute to "the parenting he received prior to CPS placement." Mother argues that she "had many successes in her years raising her boys despite the difficulties she experienced just prior to the Department's involvement in her family's life." But the record does not support this assertion. The evidence admitted at trial did not establish any specific parenting successes Mother had prior to the inception of this case.

Mother highlights what else is absent from the record: she argues there is no evidence that she had prior substantiated referrals to the Department, no evidence of her criminal history, no history of educational or medical neglect of her child, and no evidence that she had failed to meet G.M.'s physical and emotional needs for the eight years prior to the Department's involvement in the family's life. She relies heavily on the "strong presumption" that a child's best interest is usually served by keeping him with his biological parents. *See Ziegler v. Tarrant Cnty. Child Welfare Unit*, 680 S.W.2d 674, 676 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.). "Once evidence is

16

produced, however, to support a finding that that presumed fact does not exist, the case will proceed as if no presumption exists." *Id.* Viewing the evidence as a whole and giving due deference to the trial court's finding, we do not view the trial court's determination that termination was in the best interest of G.M. as unreasonable under the applicable standard. Applying the *Holley* factors, this record is replete with evidence supporting the trial court's best-interest finding:

### 1. G.M.'s Desires

Mother testified that G.M.'s goal was to be with her, "and that's what he[ was] holding on to." No other evidence of G.M.'s desires was presented at trial. But we cannot say that this factor weighs either in favor of or against the trial court's finding because there was no evidence showing sufficient maturity for eight-year-old G.M. to express his desires. *See In re J.G.*, No. 02-20-00038-CV, 2020 WL 3410503, at *7 (Tex. App.—Fort Worth May 28, 2020, no pet.) (mem. op.) (holding trial court was entitled to find that this factor weighed neither in favor of nor against termination when none of the children testified at trial, none of their maturity levels were shown at trial, and some of the children were too young to express their desires); *In re D.W.*, 445 S.W.3d 913, 926 (Tex. App.—Dallas 2014, pet. denied) (holding desire-of-child factor as neutral where children ages nine, eight, six, and five years old did not testify at trial and no evidence showed they had sufficient maturity to express a placement preference). This factor does not weigh in favor or against termination.

### 2. G.M.'s Emotional and Physical Needs

17

Children need permanency and stability. *In re G.V., III*, 543 S.W.3d 342, 350 (Tex. App.—Fort Worth 2017, pet. denied). And we have stressed that a child needs "a stable home and engaged parents who d[o] not use drugs." *In re M.J.*, No. 02-23-00026-CV, 2023 WL 3643673, at *11 (Tex. App.—Fort Worth May 25, 2023, no pet. h.) (mem. op.). Further, the trial court could have inferred that Mother's drug problems were going to continue and that, because Mother had a continuing pattern of drug abuse, she did not have the ability to meet G.M.'s current and future physical and emotional needs. *See In re A.P.*, No. 02-22-00180-CV, 2022 WL 16646478, at *10 (Tex. App.—Fort Worth Nov. 3, 2022, no pet.) (mem. op.); *In re N.H.*, No. 02-22-00157-CV, 2022 WL 4374638, at *13 (Tex. App.—Fort Worth Sept. 22, 2022, no pet.) (mem. op.). Mother herself even agreed with the Department that a little boy like G.M. needed a parent who is sober and not using drugs. And she did not otherwise demonstrate that she could meet G.M.'s current and future emotional and physical needs. This factor weighs in favor of termination.

### 3. Emotional and Physical Danger to G.M.

Mother's continued methamphetamine use could endanger G.M. physically and emotionally were he returned to her custody. *See, e.g., In re E.R.W.*, 528 S.W.3d 251, 264–65 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ("A parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being."); *In re M.E.-M.N.*, 342

18

S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied) (same); *In re D.S.*, 176 S.W.3d 873, 879 (Tex. App.—Fort Worth 2005, no pet.) ("Evidence of a parent's long-term drug use and unstable lifestyle can support a factfinder's conclusion that termination is in the child's best interest."), *superseded by statute on other grounds as recognized by In re D.A.R.*, 201 S.W.3d 229, 230–31 (Tex. App.—Fort Worth 2006, no pet.); *see also C.H.*, 89 S.W.3d at 26 (unchallenged endangerment findings can support best-interest finding). Mother admitted at trial that she had been under the influence of drugs while G.M. was in her home and that she had used methamphetamine so recently that it would show up in a hair follicle test. The trial court also heard testimony that a child G.M.'s age would want to be protective of his mother and could be physically injured or even killed trying to protect her in a domestic-violence incident. By contrast, there is no evidence in the record that the foster home posed any threat of emotional or physical danger to G.M.[14] *Cf. A.P.*, 2022 WL 16646478, at

---

[14]In her brief, Mother assails the Texas foster care system and declares, "The horror of foster placement in Texas is well known." She cites a Fifth Circuit case in which a panel of that court concluded that the State's policies with respect to caseload management, monitoring, and oversight violated the right of children in the permanent managing conservatorship of the Department to be free from a substantial risk of serious harm. *See M.D. ex rel Stukenberg v. Abbott*, 907 F.3d 237, 271 (5th Cir. 2018). Relying on that decision and a dissenting opinion from another court of appeals case, *see In re J.J.G.*, 540 S.W.3d 44, 63–64 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (Jennings, J., dissenting), Mother contends that "[t]he danger to G.M. and any child in the Texas foster care system is not speculative – it is judicially determined." She also claims that "the Department is still being cited for placements creating [an] unreasonable risk of serious harm" but cites no authority supporting this statement and only references a "Monitor's Report" that is not attached to her brief and was not offered in evidence at trial or otherwise made a part of the record in this

*11. This factor supports termination.

### 4. Mother's Parental Abilities

Mother had not demonstrated that she could provide a nurturing environment or safe and stable housing for G.M. But the Permanency Report admitted in evidence indicated that G.M.'s foster family "demonstrates defined roles, has clear boundaries, and supports [G.M.'s] growth and development." G.M. felt safe. Under the Texas Family Code, "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tex. Fam. Code Ann. § 263.307(a). This factor favors termination.

### 5. Available Programs to Mother

Despite the Department's commitment to pay for individual counseling, Mother only "engaged in a couple of sessions" with Lena Pope Home. Although Mother completed the recommended and required parenting classes, she continued to use methamphetamine and never completed the required drug assessment or mental health assessment. *See In re A.C.*, 394 S.W.3d 633, 642 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (explaining that fifth *Holley* factor weighed against mother who completed parts of Department's family services plan but continued to use drugs and never completed entire program); *Robinson v. Tex. Dep't of Protective & Regul. Servs.*, 89

---

case. On the other hand, the evidence that was admitted in this case indicated that G.M. was doing very well with his foster family. The record does not support Mother's argument that "[t]he threat to G.M. in the Texas foster care system poses a greater risk of emotional and physical harm" than Mother's neglectful supervision.

S.W.3d 679, 688–89 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (upholding termination in children's best interest when mother continued to use drugs and left ameliorative family support programs incomplete). This factor supports termination.

6.     Plans for G.M.

The Department's plan for G.M. was family reunification, but because that could not be reached, it sought permanent managing conservatorship of G.M. until he could be adopted. It planned to have G.M. placed with a relative or fictive kin. Mother believed that it was best for G.M. to stay in foster care for the time being. Her plan was to stay with her friends in North Richland Hills until she was financially stable again. "Stability and permanence are paramount in the upbringing of children." *M.E.-M.N.*, 342 S.W.3d at 263. Although both parties' plans for G.M. involved some instability and impermanence, Mother's plan was less well-defined than the Department's. Mother was not ready to care for G.M. at the time of trial, and the Department at least provided for G.M. while searching for a permanent home. This factor weighs slightly in favor of termination.

7.     Stability of the Home/Proposed Placement

A permanent home was not available to G.M. at the time of trial. However, a reasonable factfinder could infer from the evidence at trial that, while G.M.'s current foster placement was not permanent, it was safe and relatively stable. *See A.P.*, 2022 WL 16646478, at *11. Mother's life, in contrast, was characterized by instability, and because of Mother's own instability, she could not offer stability to G.M. *See In re*

21

*M.S.*, No. 02-21-00007-CV, 2021 WL 2654143, at *19 (Tex. App.—Fort Worth June 28, 2021, pet. denied) (mem. op. on reh'g). This factor weighs in favor of termination.

### 8. Mother's Acts or Omissions

Mother's acts (continuing her methamphetamine use and her dangerous relationship with J.D.) and omissions (going off of her medication and leaving her court-ordered service plan incomplete) indicated that her parent–child relationship with G.M. was not a proper one. In addition, the testimony of multiple witnesses revealed that Mother repeatedly chose J.D. over G.M. The investigator testified that Mother "showed little concern for her kiddo" and had very little contact with him after J.D. left her home but before G.M. was removed. Mother also used drugs while G.M. was in her care. Months after G.M.'s removal, knowing that he had been placed in foster care and understanding that she needed to work on and complete her services to be reunited with him, Mother moved to Washington with J.D. In essence, Mother chose a transient life with her abusive paramour over trying to provide a stable home for her very young son. This factor weighs in favor of termination.

### 9. No Excuses for Mother's Conduct

The record contains little as far as excuses for Mother's acts and omissions. Mother said multiple times during her testimony, "I don't know why I do some of the things that I do." She testified that she was not on her medicine when she got back together with J.D., and she conceded that her mental health played a big part in her

life. And, although she also acknowledged that J.D. used domestic violence to control her, she admitted that he did not have any control over whether she could live in Texas and work her services. She also admitted that she "could have stayed" in Texas, but she chose to move. This factor supports termination.

## V. Conclusion

Based on our thorough review of the record, we hold that the evidence was factually and legally sufficient to support the trial court's finding that termination of Mother's parental rights to G.M. was in his best interest. *See In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.) ("A parent's drug use, inability to provide a stable home, and failure to comply with a family service plan support a finding that termination is in the best interest of the child."); *In re S.B.*, 207 S.W.3d 877, 887–88 (Tex. App.—Fort Worth 2006, no pet.) (same); *D.S.,* 176 S.W.3d at 879. We therefore overrule Mother's sole issue.

Having overruled Mother's sole issue on appeal, we affirm the trial court's order terminating Mother's parental rights to G.M.

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered: June 29, 2023

23